NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHANIE BERKOWITZ,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY OF MEDICINE AND<br>DENTISTRY OF NEW JERSEY,<br><br>Defendant. | Civil Action No. 11-719 (JLL)<br><br>**OPINION** |

**LINARES,** District Judge.

Plaintiff Chanie Berkowitz is a former employee of Defendant, the University of Medicine and Dentistry of New Jersey ("UMDNJ"). Plaintiff claims, *inter alia*, that UMDNJ interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA") by denying her request for a reduced leave schedule under the FMLA to care for her infant daughter who allegedly suffered from infantile spasms. Plaintiff also alleges that UMDNJ's denial of her request for a reduced leave schedule constituted retaliation for her use of approved intermittent FMLA leave (relating to a separate medical condition). Plaintiff maintains that UMDNJ's discriminatory and retaliatory actions in this regard eventually caused her to resign. Defendant UMDNJ has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to the instant motion. No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendant's motion [Docket Entry No. 37] is **granted in part and denied in part.**

## **BACKGROUND**

The following relevant facts are not in dispute unless noted otherwise.

Plaintiff is a female who was hired by Defendant UMDNJ as a full-time Senior Medical Coder in November of 2005. (Def. 56.1 Stmt., ¶ 2; Pl. Response, ¶ 2). Plaintiff's duties as a Senior Medical Coder involved coding in-patient records for the purposes of reimbursement. (*Id.*, ¶ 8). Plaintiff initially worked on-site, but was subsequently allowed to work remotely from her home in Brooklyn, New York. (*Id.*, ¶¶ 9, 10) (Pl. Supplemental 56.1 Stmt., ¶ 3; Def. Response, ¶ 3). In fact, Plaintiff was the first coder who was allowed to work remotely. (Def. 56.1 Stmt., ¶ 11; Pl. Response, ¶ 11).

During Plaintiff's tenure with UMDNJ, there was a maximum of six coders, some of whom lived other states. (*Id.*, ¶ 14). Susan DeSantis was the coders' direct supervisor and was Plaintiff's supervisor throughout Plaintiff's tenure with UMDNJ. (*Id.*, ¶ 15). Irene Szczech, Director of Medical Records Services, was DeSantis' supervisor, with whom DeSantis discussed all corrective actions. (*Id.*, ¶ 17).

Subsequent to her hire, Plaintiff received New Employment Orientation training given to all UMDNJ employees, which included the written policies concerning discrimination and Family Leave. (*Id.*, ¶ 4). Plaintiff signed an acknowledgement for her receipt of the employee handbook, which included a description of the policy and procedure with regard to applying for Family Leave. (*Id.*, ¶ 5). The employee handbook that Plaintiff received stated, in pertinent part, that "[i]nformation regarding your rights under FMLA is readily available in the Human Resources Department. You may elect to discuss your situation with your department head." (Pl. Supplemental Stmt., ¶ 26; Def. Response, ¶ 26) (Preuss Cert., Ex F, Pt. 3 at 81).

Plaintiff was a member of the Local 5094 Health Professionals and Allied Employees Union during her employment with UMDNJ. (Def. 56.1 Stmt., ¶ 6; Pl. Response, ¶ 6). The union contract discusses leaves of absence, including FMLA leave. (*Id.*, ¶ 7). The parties dispute whether the union contract sets forth the procedure for applying for such leave. (Def. 56.1 Stmt., ¶ 7; Pl. Response, ¶ 7).

In February 2007, DeSantis allowed Plaintiff to work nights for four weeks so that she could care for her infant daughter, Nechie, who allegedly suffered from infantile spasms. (*Id.*, ¶ 18); (Shishkin Decl., Ex. A, Berkowitz Dep. Tr. (March 28, 2012) at 92:21-25); (Shishkin Decl., Ex. F). According to Plaintiff, from 2007 to 2009, Nechi's treatment required three to four hours of therapy at home, five days per week, plus at least one additional hour of therapy at a sensory therapy center, also five days per week. (Pl. Supplemental 56.1 Stmt., ¶ 6). Nechie also needed close follow-up care from a neurologist. (*Id.*). Plaintiff never submitted medical documentation regarding Nechi's illness to Human Resources ("HR") at UMDNJ. (Def. 56.1 Stmt., ¶ 19; Pl. Response, ¶ 19).

On or about August 3, 2007, Plaintiff telephoned DeSantis requesting a change to a four-day, part-time employment schedule. (*Id.*, ¶ 20). Szczech approved Plaintiff's transition to part-time and on August 6, 2007 DeSantis sent Plaintiff an e-mail confirming this. (*Id.*, ¶¶ 22, 23).

In July 2008, UMDNJ suffered from a backlog of files that needed to be scanned so that coders could work with them. (*Id.*, ¶ 25). UMDNJ asked Plaintiff to come on-site to help scan, but Plaintiff refused. (*Id.*, ¶¶ 26, 27).

Accurately coding the diagnosis of a physician to numeric codes impacts the level of insurance reimbursement for UMDNJ. (*Id.*, ¶ 31). Thus, UMDNJ maintained certain standards for coding accuracy. (*Id.*, ¶ 30). In this regard, auditors within the Medical Records Department

would review coder input to assess their accuracy and completeness. (*Id.*, ¶ 35). The auditor's monthly report did not cite individual coders by name. (*Id.*, ¶ 37).

The parties agree that during Plaintiff's employment at UMDNJ, there was no policy in place requiring remote coders to work on-site at UMDNJ's facility some or all of the time. (Pl. Supplemental 56.1 Stmt., ¶ 1; Def. Response, ¶ 1). The parties dispute, however, whether UMDNJ had a policy in place that working remotely was contingent upon coder accuracy. (Def. 56.1 Stmt., ¶ 32; Pl. Response, ¶ 32). According to UMDNJ, if coder accuracy fell below the 95% threshold, managers could request remote coders to come on-site. (Def. 56.1 Stmt., ¶ 33). There is no dispute, however, that two coders besides the plaintiff did not meet the accuracy standard and were required to come on-site. (Def. 56.1 Stmt., ¶ 38; Pl. Response, ¶ 38). One of these coders no longer works for UMDNJ because he or she could not come on-site. (*Id.*, ¶ 40).

Plaintiff's overall coding accuracy fell to a 38% error rate in March 2008. (*Id.*, ¶ 41). Plaintiff's error rate was 27% in April of 2008, 22% in May, and 13% in June. (*Id.*, ¶ 42). Plaintiff's error rate spiked to 32% in July 2008. (*Id.*, ¶ 43). All of the preceding overall coding accuracy rates were below UMDNJ standards. (*Id.*, ¶ 44).

In early August 2008, Plaintiff informed DeSantis that she was pregnant again and due to give birth in February 2009. (Pl. Supplemental 56.1 Stmt., ¶ 7; Def. Response, ¶ 7). Managers are not authorized to approve a leave of absence. (*Id.*, ¶ 51). Thus, on or around August 13, 2008, Plaintiff informed HR Generalist Nimia Valencia that she was pregnant and applied for intermittent FMLA leave for pregnancy-related complications, as well as a subsequent maternity leave. (Pl. Supplemental 56.1 Stmt., ¶ 8; Def. Response, ¶ 8). As part of her application, Plaintiff submitted a Certification of the Health Care Provider from her doctor indicating that she needed intermittent leave due to her pregnancy that would likely end upon delivery. (Def. 56.1

4

Stmt., ¶ 55; Pl. Response, ¶ 55). Plaintiff's intermittent FMLA leave for a "serious health condition of self" was approved by UMDNJ effective August 13, 2008. (*Id.*, ¶ 56). The specific reason for Plaintiff's leave was not shared with her department due to HIPAA concerns. (*Id.*, ¶ 57). Thus, Szczech did not know the reason for Plaintiff's leave. (*Id.*, ¶ 58).[1] DeSantis was likewise not informed by HR that the reason for FMLA was due to Plaintiff's pregnancy; rather, HR told DeSantis that Plaintiff's leave was for "medical reasons." (*Id.*, ¶¶ 59, 60).

Also in early August 2008, Plaintiff received a phone call from the UMDNJ coding auditor, Judith Powers, who issued a formal counseling to Plaintiff due to deficient coding accuracy. (Def. 56.1 Stmt., ¶ 45; Pl. Response, ¶ 45). As a result, Plaintiff was requested to come on-site for additional training until her performance met the necessary standard. (*Id.*, ¶ 46). A follow-up email dated August 7, 2008,[2] explained the details, asking Plaintiff to report on-site on August 25, 2008. (*Id.*, ¶ 47). Plaintiff contacted her union representative to resist coming on-site and signing the formal counseling. (*Id.*, ¶ 48). Although the parties dispute *why* UMDNJ ultimately decided against requiring Plaintiff to appear on-site, the parties agree that Plaintiff did

---

[1] Although Plaintiff indicates that paragraph number 58 of Defendant's 56.1 Statement is "Disputed," Local Civil Rule 56.1 provides, in pertinent part as follows: "The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement **and, if not agreed, stating each material fact in dispute <u>and</u> citing to the affidavits and other documents submitted in connection with the motion**; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." Plaintiff cites to no evidence in the record in support of her dispute of paragraph 58 of Defendant's 56.1 Statement. Thus, paragraph 58 of Defendant's 56.1 Statement is hereby deemed admitted. *See* Fed.R.Civ.P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion.").

[2] Although Defendant's 56.1 Statement states that said "follow-up" email was dated "August 7, 2007," given the context of said email, the Court will assume that such reference to 2007 was a typographical error and should, instead, read 2008.

not report on-site on August 25, 2008 and Plaintiff continued to be audited, reviewed, and trained remotely. (*Id.*, ¶¶ 49, 50).

On August 27, 2008, Plaintiff took her first day off as part of her approved intermittent FMLA leave. (Pl. Supplemental 56.1 Stmt., ¶ 13; Def. Response, ¶ 13). On the same day, Plaintiff's supervisor, DeSantis, sent Szcech an e-mail stating: "and of course she will be throwing in the wrench as much as possible now how do we prove she is not calling in for another condition since she never called me or you to discuss up front her situation!" (*Id.*, Shishkin Decl., Ex. R).

On the following day—August 28, 2008—Szczech sent an email to Nimia Valencia of HR stating that: "as you know Beth Halpin resigned after her first day in orientation. We have since received resignation letters from Deanna Mannigan with last day 9/11/08 and today from Sonya Manuel with last day 9/29/08. It is IMPERATIVE that both part time positions for Chanie Berkowitz and Christi Horstmann be converted back to full time positions as they were hired. What is the status of this change in PT to FT status?" (Shishkin Decl., Ex. U).

Plaintiff testified that in the period following the approval of her intermittent FMLA leave, DeSantis would give her a "very hard time" each time she needed to take a sick day or go to the doctor. (Shishkin Decl., Ex A, Berkowitz Dep. Tr. (March 28, 2012) at 171:11-171:1). In particular, Plaintiff testified that DeSantis would make comments to her, such as, [you're] out sick again, or, do you need to take the whole day. (*Id.*).

In August or September 2008, two of the six coders resigned. (Def. 56.1 Stmt., ¶ 61; Pl. Response, ¶ 61). In mid-to-late September 2008, Szczech sent Plaintiff a letter informing her that she was required to return to work full-time effective October 27, 2008 due to the lack of

staff and the inability to meet the billing needs of UMDNJ. (*Id.*, ¶ 62). Another part-time coder received the same request. (*Id.*, ¶ 63).

Plaintiff subsequently telephoned DeSantis in early October 2008 to ask if there was a way for Plaintiff to remain part-time so that she could provide medical care to her child who was still having health issues and needed frequent therapy and medical treatment; DeSantis denied Plaintiff's request. (*Id.*, ¶¶ 65, 66) (Pl. Supplemental 56.1 Stmt., ¶ 20; Def. Responsive, ¶ 20). In particular, Plaintiff testified that DeSantis told her "there's nothing to talk about," "take it or leave it." (Shishkin Decl., Ex. A, Berkowitz Tr. (March 28, 2012) at 121:16-23). DeSantis never asked Plaintiff to put her request in writing, nor did she refer Plaintiff to HR. (Pl. Supplemental 56.1 Stmt., ¶ 22; Def. Response, ¶ 22). Plaintiff did not follow-up with DeSantis in writing, nor did she voice any concerns regarding the resumption of her full-time schedule to Szcech, HR or her union. (Def. 56.1 Stmt., ¶¶ 66, 67; Pl. Response, ¶¶ 66, 67). DeSantis did discuss Plaintiff's request to remain part-time with Szczech, although it is unclear when this conversation occurred. (Pl. Supplemental 56.1 Stmt., ¶ 23; Def. Response, ¶ 23).

Plaintiff resumed a full-time, five-day work schedule on October 27, 2008. (Def. 56.1 Stmt., ¶ 68; Pl. Response, ¶ 68). Plaintiff does not know who made the decision to change her back to full-time. (*Id.*, ¶ 69). Plaintiff further admits that another part-time coder "likely" was required to change their status to full-time. (*Id.*, ¶ 70). The parties agree that at least three coders resigned between August 2008 and December 2008. (*Id.*, ¶ 72).

Plaintiff again telephoned DeSantis in December of 2008 to tell her that Plaintiff could not continue to work a full-time schedule and if such a schedule was necessary she could no longer work for UMDNJ. (Def. 56.1 Stmt., ¶ 73; Pl. Response, ¶ 73). DeSantis could not change her schedule. (*Id.*, ¶ 74). According to UMDNJ, Plaintiff did not contact Szczech, HR,

her union, or UMDNJ labor relations about her need to go back to a part-time schedule. (Def. 56.1 Stmt., ¶ 75). Plaintiff maintains, however, that she sent a letter of medical necessity—dated February 2007—to DeSantis; it is unclear, however, whether this was done before or after her December 2008 telephonic conversation with DeSantis. (Pl. Response, ¶ 75). In any event, the parties agree that Plaintiff did not provide DeSantis or anyone else at UMDNJ with any additional medical documentation that would indicate that she needed to work only four days a week because of her daughter's condition. (*Id.*, ¶ 76). Moreover, Plaintiff admits that she never submitted an application or any form of documentation to UMDNJ requesting FMLA in order to care for her ill daughter. (*Id.*, ¶ 77).

On December 10, 2008, UMDNJ gave Plaintiff a poor performance review for 2008. (Pl. Supplemental 56.1 Stmt., ¶ 40; Def. Response, ¶ 40). In the same performance evaluation, DeSantis required Plaintiff to reach an overall coding accuracy average of at least 95% by the end of the calendar year or she would be required to start working onsite in Newark three days per week, so as to "re-assess her skills and provide remedial training." (*Id.*, ¶ 42). According to Plaintiff, because she did not drive, her commute to Newark from Brooklyn would have been prohibitively expensive and time-consuming. (Shishkin Decl., Ex. J).

In a January 1, 2009 email to DeSantis, Plaintiff resigned effective February 9, 2009. (*Id.*, ¶ 79). Shortly before she resigned, Plaintiff reiterated to DeSantis that working five days per week was a hardship. (Pl. Supplemetnal 56.1 Stmt., ¶ 37; Def. Response, ¶ 37).

In light of the foregoing, Plaintiff commenced the instant cause of action in February 2011. Plaintiff filed an Amended Complaint in March 2011. This Court's jurisdiction over Plaintiff's Amended Complaint is premised on 28 U.S.C. §§ 1331, 1367(a). Plaintiff's Amended

Complaint asserts five (5) causes of action: (1) interference with rights in violation of the FMLA, (2) retaliation in violation of the FMLA, (3) pregnancy/gender discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* ("NJLAD"), (4) interference with rights in violation of the New Jersey Family Leave Act, N.J.S.A. § 34:11B-1, *et seq.* ("NJFLA"), and (5) retaliation in violation of the NJFLA.

Defendant now moves for summary judgment as to all claims. The Court begins by noting that Plaintiff has indicated an intent to withdraw her NJLAD claim. *See* Pl. Opp'n Br. at 1, n. 1). Defendant does not directly address this in its reply brief. Thus, the Court deems Count Three of Plaintiff's Amended Complaint as withdrawn; such claim is dismissed without prejudice.

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson,* 477 U.S. at 242-43 ("At the

summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

With this framework in mind, the Court turns now to Defendant's motion.

## ANALYSIS

Defendant moves for summary judgment as to all claims on two grounds: (1) all claims are barred by the applicable statute of limitations, and (2) Plaintiff has failed to prove the necessary elements of each of her claims.

### A.    FMLA Claims

"Congress passed the FMLA in 1993 in an attempt 'to balance the demands of the workplace with the needs of families.' " *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012). Thus, the FMLA "entitle[s] employees to take reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), but employees must do so "in a manner that accommodates the legitimate interests of employers," 29 U.S.C. § 2601(b)(3). Generally speaking, eligible employees are entitled to take FMLA if they "care for" a family member with a "serious health condition." A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

"Even when these qualifying circumstances exist, employees cannot invoke rights under the FMLA if they fail to provide adequate notice of their need for leave." *Lichtenstein*, 691 F.3d at 301 (citing 29 U.S.C. § 2612(e)). "When the need for leave is unforeseeable, employees are obligated to notify their employer 'as soon as practicable,' 29 C.F.R. § 825.303(a), and 'provide

sufficient information for an employer to reasonably determine whether the FMLA may apply,' 29 C.F.R. § 825.303(b)." *Id.*

"[T]he FMLA contains two relatively distinct types of provisions. First, it creates a series of prescriptive substantive rights for eligible employees, often referred to as the 'entitlement' or 'interference' provisions which set floors for employer conduct." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). In addition, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the 'discrimination' or 'retaliation' provisions." *Id.* (citing 29 U.S.C. § 2615(a)(1) and (2)). In particular, "employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.' " *Id.* (citing 29 C.F.R. § 825.220(c)).

Plaintiff here asserts both types of claims under the FMLA. The crux of Count One is that Defendant interfered with Plaintiff's right to a reduced leave schedule (to care for her ailing daughter) pursuant to the FMLA by denying said request. (Am. Compl., ¶ 17). The crux of Count Two is that Defendant retaliated against Plaintiff for her use of approved intermittent FMLA leave (due to pregnancy-related complications and subsequent maternity leave).

### 1.    Count One—FMLA Interference Claim

"In order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Callison,* 430 F.3d at 119 (citing 29 U.S.C. §§ 2612(a), 2614(a)). In support of its motion, Defendant argues that: (1) Plaintiff cannot demonstrate her eligibility to receive benefits under the FMLA because she never gave Defendant notice of her intention to take FMLA leave because of her

daughter's medical condition, and (2) Plaintiff cannot demonstrate that her request for FMLA leave was ever denied by the Defendant because she never requested it.[3]  It is clear that both aspects of Defendant's argument hinge on the overarching theory that Plaintiff never properly requested FMLA leave in connection with her request to return to a four-day workweek schedule in October 2008.

On the issue of notice, the Third Circuit has held:

> To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave. 29 U.S.C. § 2612(e)(2). In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* (emphasis added). As we have previously noted, this is not a formalistic or stringent standard.
>
> While the FMLA "does not require an employer to be clairvoyant," this does not mean that employees need to provide every detail necessary for the employer to verify if the FMLA applies. This conclusion is dictated by the language of 29 C.F.R. § 825.303(a), which provides that "where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying" (emphasis added). The regulations thus clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies. Accordingly, the "critical test" is not whether the employee gave every necessary detail to determine if the FMLA applies, but "how the information conveyed to the employer is reasonably interpreted." How the employee's notice is reasonably interpreted is generally a question of fact, not law.

---

[3] Defendant's motion does not raise the issue of whether Plaintiff was otherwise entitled to benefits under the FMLA.

*Lichtenstein*, 691 F.3d at 303-04 (internal citations omitted). Moreover, the Third Circuit has defined "employer" to include its supervisors. *See Haybarger v. Lawrence County Adult Probation and Parole*, 667 F.3d 408, 415 (3d Cir. 2012) ("[J]ust as a real estate management company acting as an agent for building owners may be liable as an employer under the FLSA, an individual supervisor working for an employer may be liable as an employer under the FMLA."); *see, e.g., Lichtenstein*, 691 F.3d at 304 ("Lichtenstein correctly followed UPMC's call-off procedure by calling UPMC's nursing supervisor soon after arriving at the emergency room. This is sufficient to establish a genuine dispute about whether Lichtenstein notified UPMC 'as soon as [was] practicable under the facts and circumstances.'").

There is no dispute that in mid-to-late September 2008, Szczech sent Plaintiff a letter informing her that she was required to return to work full-time effective October 27, 2008, due to a shortage of staff and the inability to meet the billing needs of UMDNJ.[4] There is evidence in the record suggesting that Plaintiff subsequently telephoned DeSantis, her supervisor, in early October of 2008 to ask if there was a way for Plaintiff to remain part-time,[5] and that DeSantis denied Plaintiff's request,[6] without asking Plaintiff to put her request in writing and without referring Plaintiff to HR.[7]

---

[4] (Def. 56.1 Stmt., ¶ 62; Pl. Response, ¶ 62).

[5] (*Id.*, ¶¶ 65, 66).

[6] (*Id.*, ¶¶ 65, 66). To be clear, DeSantis does not expressly dispute that she denied Plaintiff's request to remain in part-time status during the October 2008 phone call; rather, DeSantis testified that she did not recall having the October 2008 telephone conversation with Plaintiff. (Shishkin Decl., Ex. B, DeSantis Dep. Tr. (March 29, 2012) at 192:12-16).

[7] (Pl. Supplemental 56.1 Stmt., ¶ 22; Def. Response, ¶ 22).

There is also evidence in the record indicating that during Plaintiff's October 2008 telephone conversation with DeSantis, she explained to DeSantis that the reason why she was requesting a four-day schedule was to "provide medical care and other care for her child" who required "therapy" and "frequent medical treatment[s]." (Shishkin Cert., Ex. C, DeSantis Dep. Tr. (Sept. 20, 2013) at 10:22-11:21). In this regard, Plaintiff testified that during this telephone conversation, she explained to DeSantis that:

> It was extremely difficult for me to work full-time while caring for my daughter that's [sic] really sick and her diagnosis and her treatment are so complex, that I really needed to work a four day work week, and if there's anything we can do about it so I can stay in that position of part-time.

(Shishkin Cert., Ex. A, Berkowitz Dep Tr. (March 28, 2012) at 120:22-121:4). Finally, there is also evidence in the record suggesting that this telephone conversation took place in early October 2008, that is, "shortly after" Plaintiff received Defendant's letter requiring her to resume a five-day workweek schedule. *Id.* at 119:10-12.

The Third Circuit has indicated that once an employer receives notice that an employee has a serious health condition,[8] or indicates a need to "care for"[9] a family member with a serious

---

[8] A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see also* 29 C.F.R. § 825.114 (defining inpatient care as "an overnight stay in a hospital"). The Court makes no finding as to whether Plaintiff's daughter suffered from a serious health condition and thus, whether Plaintiff was, in fact, entitled to a reduced leave schedule under the FMLA because Defendant does not raise this argument. To the contrary, Defendant's theory is that Plaintiff was not entitled to such leave under the FMLA because she never properly requested it. (Def. Br. at 14) ("Plaintiff likewise cannot show that she was eligible for a reduced leave schedule. She never gave the defendant notice of her intention to take a leave because of her daughter's medical condition.").

[9] To "care for" a family member "includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term

health condition, the employer has a duty to advise the employee of his rights under the FMLA. *See Conoshenti*, 364 F.3d at 143 ("PSE & G did not advise Conoshenti of his rights under the FMLA. As we have also noted, the regulation under the FMLA imposed a duty on PSE & G to do so."). When the facts are viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff provided DeSantis with sufficient notice of her intent to request FMLA leave in the form of a reduced leave schedule and that DeSantis failed to advise Plaintiff of her potential rights under the FMLA. *See generally Sarnowski*, 510 F.3d at 403 ("[W]here courts have found notice to be deficient, it has been because the employee failed to convey the reason for needing leave.").

Thus, Plaintiff can prove interference with her right to leave under the FMLA if she is "able to establish that this failure to advise rendered [her] unable to exercise that right in a meaningful way." *Conoshenti*, 364 F.3d at 143. Plaintiff can meet this burden if she can demonstrate that she was prejudiced as a result of Defendant's failure to advise. *Id.* at 144 ("[T]he Supreme Court would find an actionable "interference" in violation of § 2615(a) here in the event Conoshenti is able to show prejudice as a result of that violation."). To the extent Plaintiff can prove that she would have been entitled to a reduced leave schedule under the FMLA by virtue of her daughter's medical condition,[10] viewing the evidence in the record in the light most favorable to the Plaintiff, the Court finds that a reasonable jury could conclude that she was prejudiced by Defendant's denial because it ultimately caused her to resign from her

---

also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care." 29 C.F.R. § 825.124(a).

[10] Again, Defendant does not rely on this argument in support of its motion for summary judgment as to Count One.

position at UMDNJ. *See* Preuss Cert., Ex C., Berkowitz Dep. Tr. (March 28, 2012) at 136:4) ("I believe I told her it's impossible for me to work the five day work week while caring for my daughter.").

Defendant nevertheless urges the Court to enter summary judgment in its favor because "the record shows that plaintiff had been extensively educated about the availability of FMLA leave in August of 2008 when she successfully applied for intermittent FMLA to deal with certain issues that had arisen with her pregnancy." (Def. Br. at 15). Although Defendant's argument in this regard may ultimately go to Plaintiff's credibility, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and are thus inappropriate at the summary judgment stage. *Anderson*, 477 U.S. at 255. Suffice it to say that there is a genuine dispute as the following material facts: (1) whether Plaintiff sufficiently conveyed her need for leave to satisfy the notice requirements of the FMLA, and (2) as to how such notice was reasonably interpreted by UMDNJ. *See, e.g., Sarnowski*, 510 F.3d at 403 (concluding that defendant had sufficient notice of plaintiff's need for leave to satisfy the notice requirements of the FMLA where plaintiff, "a man with chronic heart problems, had missed approximately six weeks of work for quintuple coronary artery bypass surgery. He informed his supervisor of his need for monitoring and possible additional surgery. He was not certain that he would need surgery, but he conveyed what information he had and made it clear to his employer that his health problems were continuing. Eight days later, Sarnowski was terminated."). This is particularly relevant given that there is no dispute in this case that Defendant did not advise Plaintiff of her rights under the FMLA, if any, in connection with her request to remain in a reduced leave schedule as a result of her daughter's medical condition. *See Conoshenti*, 364 F.3d at 143 ("PSE & G did not advise

16

Conoshenti of his rights under the FMLA. As we have also noted, the regulation under the FMLA imposed a duty on PSE & G to do so."). To the contrary, Defendant's position is that Plaintiff was never denied a request to remain in a reduced leave schedule because she never properly requested it. (Def. Br. at 14); *see also* Shishkin Decl., Ex. B, DeSantis Dep. Tr. (March 29, 2012) at 192:12-193:9). Having determined that there are material issues of fact in dispute surrounding whether Plaintiff sufficiently conveyed her need for leave to satisfy the notice requirements of the FMLA, Defendant's motion for summary judgment as to Count One is therefore denied.[11] *See generally Lichtenstein*, 691 F.3d at 303-04 ("[T]he 'critical test' is not whether the employee gave every necessary detail to determine if the FMLA applies, but 'how the information conveyed to the employer is reasonably interpreted.' How the employee's notice is reasonably interpreted is generally a question of fact, not law.") (citations omitted).

### a.   Statute of Limitations

Defendant next argues that Plaintiff's claim of interference under the FMLA is time-barred inasmuch as the letter sent by Defendant to Plaintiff informing her that she had been returned from part-time to full-time status was sent to her on September 30, 2008, which was approximately two years and four months before the filing of her Complaint. (Def. Br. at 9). Plaintiff does not dispute that a two year statute of limitations generally applies to FMLA claims.

---

[11] Defendant also urges the Court to dismiss Count One on the basis that: (1) the sole remedy available under the FMLA for an alleged interference with her rights is lost wages, and (2) Plaintiff cannot show that her reinstatement to full-time status caused her to lose compensation. Even assuming, *arguendo*, that Defendant is correct in stating that the sole remedy available to Plaintiff is lost wages—a finding that this Court does not make—Defendant's argument in this regard is rejected inasmuch as Count One alleges that Defendant's interference with Plaintiff's rights under the FMLA caused Plaintiff to resign, which resulted in, among other things, a loss of salary and other benefits. (Am. Compl., ¶¶ 21-24).

*See* 29 U.S.C. § 2617(c)(1) ("Except as provided in paragraph (2), an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought."). Rather, Plaintiff maintains that a three year statute of limitations should apply to her claim of interference inasmuch as Defendant's actions in interfering with her FMLA rights were willful. *See* 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought.").

The Court begins its analysis by reiterating that the statute indicates that both the two-year and three-year statute of limitations are triggered from the "last event constituting the alleged violation for which such action is brought." *See* 29 U.S.C. § 2617(c)(1); 29 U.S.C. § 2617(c)(2). There is no dispute that Plaintiff received the letter informing her that she was required to return to full-time status in September 2008.[12] There is also evidence in the record suggesting that Plaintiff's subsequent request to remain in part-time status was made to DeSantis, in a telephone call, in early October 2008 and that said request was denied by DeSantis on the same call.[13] Plaintiff argues that the statute of limitations on her FMLA claim did not begin to run until the day she was forced to resign because "each time Defendant failed to permit her to [return to her four-day schedule] . . . interfered with her rights." (Pl. Opp'n Br. at 19). Plaintiff cites to no legal authority—much less binding legal authority—in support of this theory. Absent any binding legal authority suggesting otherwise, the Court construes the last event constituting Defendant's alleged interference with Plaintiff's FMLA rights as DeSantis' denial of Plaintiff's

---

[12] (Def. 56.1 Stmt., ¶ 62; Pl. Response, ¶ 62); (Preuss Cert., Ex. M).

[13] (Def. 56.1 Stmt., ¶¶ 65, 66; Pl. Response, ¶¶ 65, 66) (Pl. Supplemental 56.1 Stmt., ¶ 20; Def. Responsive, ¶ 20); (Shishkin Decl., Ex. A, Berkowitz Tr. (March 28, 2012) at 121:16-23).

request to remain in part-time status, which allegedly took place in early October 2008. Plaintiff's Complaint was filed in February 2011. Thus, Count One is timely only to the extent the Court determines that Defendant's alleged interference with Plaintiff's FMLA rights was willful, thereby triggering the three year statute of limitations.

Although neither the Supreme Court nor the Third Circuit have defined "willfulness" under the FMLA, several Courts of Appeals that have addressed the issue have applied the Supreme Court's definition of willfulness in the context of FLSA to cases brought under the FMLA.[14] "[I]n order to establish a willful violation of the FMLA, a plaintiff must show that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.' " *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (defining willfulness standard applicable in FLSA cases as whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute")); *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1296 (3d Cir. 1991) (construing willfulness standard in FLSA cases as an employer's "evident indifference" toward the requirements imposed by the FLSA). Absent a directive from the Court of Appeals for the Third Circuit, this Court will be

---

[14] *See, e.g., Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003); *Porter v. New York University Sch. Of Law*, 392 F.3d 530 (2d Cir. 2004) (agreeing with *Hillstrom* decision and concluding that employer acts "willfully" under FMLA when he or she knew or showed reckless disregard for matter of whether its conduct was prohibited by FMLA"); *Hoffman v. Professional Med Team*, 394 F.3d 414, 418 (6th Cir. 2005) ("[T[he standard for willfulness under the FMLA extended statute of limitations is whether the employer intentionally or recklessly violated the FMLA."); *Hanger v. Lake County*, 390 F.3d 579, 583 (8th Cir. 2004) ("Like the First Circuit, we believe the Supreme Court's definition for 'willful' under the FLSA applies to the term 'willful' in the FMLA."); *Bass v. Potter*, 522 F.3d 1098, 1104 (10th Cir. 2008) ("[W]e find our sister circuits' reasoning sound and hold that *McLaughlin's* willfulness standard applies to the FMLA.").

guided by those Courts of Appeals that have construed willfulness under the FMLA as equivalent to willfulness under the FLSA (as defined by the Supreme Court in *McLaughlin,* 486 U.S. at 133). *See supra* note 14.

Plaintiff has come forward with no evidence suggesting that Defendant knew its conduct—in denying Plaintiff's request to remain in part-time status—was prohibited by the FMLA. Based on the reasons that follow, the Court nevertheless concludes that Defendant's motion for summary judgment as to Count One must be denied because there are material issues of fact in dispute as to: (1) whether Plaintiff provided DeSantis with sufficient notice of her intent to request FMLA leave in the form of a reduced leave schedule, and (2) whether DeSantis (and/or Szczech) made an adequate inquiry into exactly what was required of them by the FMLA before denying her request to remain in part-time status. *See, e.g., Conoshenti*, 364 F.3d at 143 ("PSE & G did not advise Conoshenti of his rights under the FMLA. As we have also noted, the regulation under the FMLA imposed a duty on PSE & G to do so.").

For instance, as previously stated, there is evidence in the record suggesting that, during their October 2008 telephone call, Plaintiff explained to DeSantis that the reason for her request to remain in part-time status was because her infant daughter was "really sick" and suffered from a "complex" medical condition that required ongoing treatment.[15] There is also evidence in the record suggesting that, at the conclusion of their October 2008 telephone call, DeSantis never asked Plaintiff to put her request—to remain in part-time status—in writing, nor did she refer Plaintiff to the Human Resources Department.[16] On the other hand, evidence in the record suggests that DeSantis did not recall having this October 2008 phone conversation with

[15] (Shishkin Decl., Ex. A, Berkowitz Dep Tr. (March 28, 2012) at 120:22-121:4).

[16] (Pl. Supplemental 56.1 Stmt., ¶ 22; Def. Response, ¶ 22); (Berkowitz Cert., ¶ 3); (Shishkin Dec., Ex. B, DeSantis Dep. Tr. (March 29, 2012) at 193:1-6).

Plaintiff.[17] Moreover, DeSantis testified that had she received such a request for a schedule change from Plaintiff, she would have asked Plaintiff to put such request in writing and would have advised her supervisor, Szczech, of Plaintiff's request.[18]

As previously stated, once an employer receives notice that an employee has a potentially serious health condition, the employer has a duty to advise the employee of his rights under the FMLA. *See Conoshenti*, 364 F.3d at 143. Viewing the evidence in light most favorable to the Plaintiff, the non-moving party, the Court finds that a reasonable jury might conclude that Plaintiff provided DeSantis with sufficient notice of her intent to request FMLA leave in the form of a reduced leave schedule, and that DeSantis failed to take the proper steps following her October 2008 telephone call with Plaintiff, in reckless disregard of the requirements of the FMLA. *See, e.g., Conoshenti*, 364 F.3d at 143. In particular, a reasonable jury might conclude that, under the circumstances, DeSantis's failure to ascertain whether Plaintiff's request implicated any rights under the FMLA and/or failure to apprise Plaintiff of her potential rights under the FMLA constituted an evident indifference toward the requirements imposed by the FMLA. *See, e.g., Martin*, 949 F.2d at 1296 (construing willfulness standard in FLSA cases as an employer's "evident indifference" toward the requirements imposed by the FLSA). While it may be true that an employer who acts unreasonably in determining its legal obligations under the FMLA does not necessarily act willfully (within the meaning of the statute),[19] based on the tone

---

[17] (Shishkin Decl., Ex. B, DeSantis Dep. Tr. (March 29, 2012) at 192:12-16).

[18] (Shishkin Decl., Ex. B, DeSantis Dep. Tr. (March 29, 2012) at 192:12-193:9).

[19] *See Hillstrom*, 354 F.3d at 33 ("If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful. . . . If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then ... it should not be ... considered [willful.]") (quoting *McLaughlin*, 486 U.S. at 133).

of the email sent from DeSantis to her supervisor Szczech just two months prior to her October 2008 call with the Plaintiff,[20] the Court finds that it would be reasonable for a jury to infer that DeSantis' alleged actions stemming from the October 2008 call were more than simply unreasonable. In other words, there is sufficient evidence in the record upon which a reasonable jury could find that DeSantis acted recklessly in assessing UMDNJ's legal obligations vis-à-vis the FMLA before denying Plaintiff's request to remain in part-time status to care for her daughter. See Hillstrom, 354 F.3d at 33 (quoting McLaughlin, 486 U.S. at 133); Conoshenti, 364 F.3d at 143.

As a result, the Court concludes that there are issues of fact as to whether Defendant's alleged interference in Plaintiff's FMLA rights was willful, and thus as to whether a two-year or three-year statute of limitations applies. Because Count One would not be time-barred if the jury concludes that Defendant's actions in this regard were willful, Defendant's motion for summary judgment as to Count One on the basis of statute of limitations is denied.

## 2. Counts Two—Retaliation under the FMLA

The Court begins by noting that Plaintiff's claim of retaliation under the FMLA is not premised on her October 2008 request to remain in part-time status due to her infant daughter's medical condition. Rather, Plaintiff's retaliation claim is premised on her August 2008 request for intermittent FMLA leave associated with her pregnancy. Plaintiff claims that after she exercised her FMLA rights in August 2008, she faced retaliation and harassment from her supervisor, DeSantis. In particular, Plaintiff claims that DeSantis: (1) verbally harassed her each

---

[20] See Shishkin Decl., Ex. R ("[A]nd of course she will be throwing in the wrench as much as possible now how do we prove she is not calling in for another condition since she never called me or you to discuss up front her situation!").

time she invoked her intermittent FMLA leave, and (2) retaliated against her by forcing her to return to full-time status in October 2008, which ultimately caused her to resign.

When an employee invokes rights granted under the FMLA, employers may not, *inter alia,* "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." *Lichtenstein*, 691 F.3d at 301 (citing 29 U.S.C. § 2615(a)(2)). To establish a prima facie case under the retaliation theory, a plaintiff must show that: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." *Conoshenti v. Public Service Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir. 2004). Once Plaintiff establishes a prima facie case, the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green* applies. 411 U.S. 792, 800-06 (1973). *See, e.g., Lichtenstein*, 691 F.3d at 302 ("Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."). The burden then shifts to Defendant to establish a legitimate, non-discriminatory reason for the employment actions. *McDonnell Douglas*, 411 U.S. at 802. Then, the burden shifts back to Plaintiff to offer sufficient evidence that the reason offered by Defendant was a pretext for retaliation. *Id.*

Defendant moves for summary judgment on the basis that Plaintiff has failed to establish a prima facie case of retaliation. In particular, Defendant argues that: (1) Plaintiff did not suffer an adverse employment action, (2) Plaintiff cannot show that there was a causal connection between her taking intermittent FMLA leave and any adverse employment decision, (3) Plaintiff cannot show that the legitimate business reasons enunciated by Szczech for her decision to return Plaintiff to full-time status were a pretext for retaliation. (Def. Br. at 18).

There is no dispute that, on or around August 13, 2008, Plaintiff applied for intermittent FMLA leave for pregnancy-related complications, as well as a subsequent maternity leave. (Pl. Supplemental 56.1 Stmt., ¶ 8; Def. Response, ¶ 8). There is also no dispute Plaintiff's application for intermittent FMLA leave was approved by UMDNJ effective August 13, 2008. Def. 56.1 Stmt., ¶¶ 55, 56; Pl. Response, ¶¶ 55, 56).

Generally speaking, in order to pass the summary judgment standard, "the adverse employment action must be sufficiently severe and concrete to affect the 'compensation, terms, conditions, or privileges' " of employment. *Sconfienza v. Verizon Pennsylvania Inc.*, 307 Fed. Appx. 619, 621-622 (3d Cir. 2008) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1298 (3d Cir. 1997) (addressing "adverse employment action" in context of Title VII cases).   In the context of Title VII cases, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." ' " *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

The adverse employment action alleged by Plaintiff in her Complaint is Defendant's unilateral restoration of her employment to full-time status, which occurred in September/October 2008.[21]  Defendant argues that Plaintiff cannot show that she suffered an adverse employment action by virtue of being restored to full-time status because it had the result of increasing her pay.  Defendant cites to no legal authority in support of this position.

---

[21] To the extent Plaintiff now argues that Defendant's request that she work on-site in Newark also constitutes an adverse employment action, such allegation was not set forth in Count Two of her Amended Complaint and thus cannot serve as a central element of her retaliation claim inasmuch as Defendant was not given proper notice of same.

Although the Third Circuit has not definitively held that the *Burlington Northern* standard applies in the context of FMLA cases,[22] given that Defendant cites to no legal authority whatsoever in support of its position, coupled with the Supreme Court's recognition, albeit in the context of Title VII, that "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children," the Court declines to hold that Defendant's unilateral decision to change Plaintiff's employment status from part-time to full-time cannot constitute an adverse employment action as a matter of law. *Burlington Northern*, 548 U.S. at 69. To the contrary, the Court concludes that there is sufficient evidence in the record upon which a reasonable jury could find that Defendant's unilateral decision to change Plaintiff from part-time to full-time status—given her circumstances and prior to request to work part-time—could materially affect the conditions of her employment and could thus, in this context, constitute an adverse employment action. *See, e.g., Burlington Northern*, 548 U.S. at 71 ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."' ").

Next, Plaintiff must show that the adverse decision was causally related to her FMLA leave. *Conoshenti*, 364 F.3d at 146. As to this element, the Third Circuit has stated:

> To demonstrate a prima facie case of causation, Lichtenstein must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination. When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing

---

[22] *See Kasper*, 514 Fed. Appx. at 216 ("Assuming, *arguendo*, that the *Burlington Northern* standard applies in the FMLA context").

> alone to create an inference of causality and defeat summary
> judgment." "Where the temporal proximity is not 'unusually
> suggestive,' we ask whether 'the proffered evidence, looked at as a
> whole, may suffice to raise the inference.'"

*Lichtenstein*, 691 F.3d at 307 (internal citations omitted). Plaintiff points to, among other things,

the following evidence in the record in support of this element: (1) that Szczech sought to

reinstate Plaintiff to a full-time position on the same day that she received the "Intermittent

Medical Leave approval letter" for her (August 28, 2008),[23] and one day after Plaintiff invoked

her first use of approved intermittent FMLA leave (August 27, 2008),[24] (2) the email from

DeSantis to Szczech dated August 27, 2008 stating "and of course she will be throwing in the

wrench as much as possible now how do we prove she is not calling in for another condition

since she never called me or you to discuss up front her situation!",[25] and (3) Plaintiff's own

testimony that in the time period following her use of approved intermittent FMLA leave,

DeSantis would give her a "very hard time" each time she needed to take a sick day or go to the

doctor and would make comments to her, such as, [you're] out sick again, or, do you need to take

the whole day.[26]

The Court concludes that the proffered evidence, looked at as a whole, suffices to create

an inference of causality. In particular, although the actual adverse employment action—of

reinstating Plaintiff to a full-time position—did not occur until September/October 2008, the

Court finds that a reasonable jury could draw an inference of causality based on the close

---

[23] Shishkin Decl., Exs. S, U.

[24] Pl. Supplemental 56.1 Stmt., ¶ 13; Def. Response, ¶ 13; Shishkin Decl., Ex. R.

[25] Shishkin Decl., Ex. R.

[26] Shishkin Decl., Ex A, Berkowitz Dep. Tr. (March 28, 2012) at 171:11-171:1.

temporal proximity between Plaintiff's first use of approved intermittent FMLA leave (August 27, 2008) with Szczech's intense effort to reinstate Plaintiff to a full-time position on the following day. *See* Shishkin Decl., Ex. U ("It is IMPERATIVE that both part time positions for Chanie Berkowitz and Christi Horstmann be converted back to full time positions as they were hired."). When this evidence is viewed alongside the tone of the email sent by DeSantis to Szczech (also on August 27, 2008), coupled with Plaintiff's sworn testimony concerning comments made to her by DeSantis in the days and weeks following her use of approved FMLA leave, a reasonable jury could conclude that Plaintiff has established an inference of causality between use of intermittent FMLA leave (beginning in late August 2008) with Defendant's unilateral decision to reinstate Plaintiff to a full-time position (in mid-to-late September 2008).[27] *See Lichtenstein*, 691 F.3d at 307.

Thus, the burden shifts to Defendant to establish a legitimate, non-discriminatory reason for its decision to reinstate Plaintiff to a full-time position. *McDonnell Douglas*, 411 U.S. at 802. Then, the burden shifts back to Plaintiff to offer sufficient evidence that the reason offered by Defendant was a pretext for retaliation. *Id.* The Court finds that Defendant has met its burden by offering evidence that it reinstated Plaintiff to a full-time position because of a shortage in medical coders.[28] In particular, the letter mailed to Plaintiff by Szczech on September 30, 2008 stated that "Effective October 27, 2008 you will be required to return to full-time status as a

---

[27] (Def. 56.1 Stmt., ¶ 62; Pl. Response, ¶ 62).

[28] *See* Def. 56.1 Stmt., ¶ 61; Pl. Response, ¶ 61 (noting that in August or September 2008, two of the six coders resigned) (citing Preuss Cert., Ex. E, Szczech Dep. Tr. (March 30, 2012) at 139:12–19); *id.* at ¶¶ 62, 63 (noting that in mid-to-late September 2008, Szczech sent Plaintiff (and at least one other part time coder), a letter informing her that she was required to return to work full-time effective October 27, 2008, due to the lack of staff and the inability to meet the billing needs of UMDNJ.) (citing Exhibit M and E at 139:25–140:2).

Senior Medical Coder. . . . The Medical Record department is currently down to two full-time Senior Medical Coder positions and is slated to lose a third position at the end of this month . . . . Part-time positions are detrimental to our ability to manage the 'Discharged Not Final Billed (DNFB) report.' The goal is to have coding completed within seven days of discharge. For the past several months we are averaging closer to twelve days. This is not acceptable any longer." (Shishkin Decl., Ex. W). Defendant has also submitted evidence that at least one other medical coder received the same letter reinstating her to full-time status. (Preuss Cert., Ex. E, Szczech Dep. Tr. (March 30, 2012) at 139:25–140:2).

In order to demonstrate that UMDNJ's proffered justification for restoring Plaintiff to full-time status was merely pretextual, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons." *Lichtenstein*, 691 F.3d at 310 (citation omitted). To do so, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [UMDNJ's] . . . proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence." *Id.* (citation omitted). Plaintiff points to testimony by Szczech wherein she concedes that the Medical Records department was not generally able to achieve their goal of completing coding within seven (7) days. (Shishkin Decl., Ex. B, DeSantis Dep. Tr. at 65:5-67:2). In fact, she testified that it was "normal" for her department to take twelve (12) days to complete coding. (*Id.* at 67:1-2). In addition, the Court notes that DeSantis sent an email to Szczech on August 27, 2008 which could be reasonable construed by a jury as expressing skepticism over Plaintiff's use of approved intermittent FMLA leave.[29] Viewing the foregoing evidence in the light most favorable to the Plaintiff, the Court

---

[29] (Shishkin Decl., Ex. R).

concludes that it would be reasonable for a jury to disbelieve Defendant's proffered reason for changing Plaintiff to full-time status. This is particularly so given that it is unclear from the record why the average twelve (12) day completion time had suddenly become "not acceptable." (Shishkin Decl., Ex. W). *See generally Anderson*, 477 U.S. at 255 ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

Plaintiff has therefore stated a prima facie claim of retaliation under the FMLA. Defendant's motion for summary judgment on this point is denied.

### a.    Statute of Limitations

Next, Defendant argues that Count Two of Plaintiff's Amended Complaint is time-barred inasmuch as such claim is governed by a two-year statute of limitations. For the reasons already stated as to the timeliness of Count One, the Court concludes that there are material issues of fact in dispute as to whether Defendant's actions in purportedly retaliating against Plaintiff for her use of approved intermittent FMLA leave were willful, and thus as to whether a two-year or three-year statute of limitations applies.

In particular, the Court construes the last event constituting the alleged violation for which Count Two is brought as DeSantis' denial of Plaintiff's request to remain in part time status—i.e., the purported adverse employment action—which took place in October 2008. *See generally* 29 U.S.C. § 2617(c)(2) ("In the case of such action brought for a willful violation of section 2615 of this title, such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought."). For the reasons stated in the context of Count One, the Court concludes that there is sufficient evidence in the record upon

which a reasonable jury could find that DeSantis acted recklessly in assessing UMDNJ's legal obligations vis-à-vis the FMLA before denying Plaintiff's request to remain in part-time status to care for her ailing daughter. *See Hillstrom,* 354 F.3d at 33 (quoting *McLaughlin,* 486 U.S. at 133); *Conoshenti,* 364 F.3d at 143. Because Count Two would not be time-barred if the jury concludes that Defendant's actions in this regard were willful, Defendant's motion for summary judgment as to Count Two on the basis of statute of limitations is denied.

### 3. Counts Four and Five—NJFLA Interference and Retaliation Claims

Counts Four and Five assert claims of interference and retaliation in violation of the New Jersey Family Leave Act, N.J.S.A. 34:11B-1, *et seq.* Both claims are essentially premised on the same facts—namely, that Defendant's decision to reinstate Plaintiff to full-time status and/or denial of Plaintiff's request to remain in part-time status constituted: (a) interference with Plaintiff's rights under the NJFLA, and/or (b) retaliation for Plaintiff's use of approved intermittent leave. In order to make out a prima facie case that a defendant employer has violated the NJFLA, a plaintiff must show that:

> (1) plaintiff was employed by defendant;
> (2) plaintiff was performing satisfactorily;
> (3) a qualifying member of plaintiff's family was seriously injured;
> (4) plaintiff took or sought to take leave from his employment to care for his injured relative; and
> (5) plaintiff suffered an adverse employment action as a result.

*DePalma v. Building Inspection Underwriters*, 350 N.J. Super. 195, 213 (App. Div. 2002). The plaintiff has the burden of producing "some credible evidence of each element of the cause of action." *Id.*

The Court begins its analysis by noting that the parties dispute whether the requirement that "plaintiff was performing [her job] satisfactorily," remains in light of the New Jersey Supreme Court's subsequent decision in the matter of *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 454-455 (2005), where it held that "[a]ll that is necessary is that the plaintiff produce evidence showing that she was actually performing the job prior to the termination." Although Plaintiff concedes that the claim at issue in *Zive* was a claim under the NLAD—not the the NJFLA— Plaintiff nevertheless urges the Court to apply this variation of the requirement given that the *DePalma* decision was premised on the notion that claims under the NJFLA "must follow the pattern applicable to claims under the Law Against Discrimination (LAD)." *DePalma*, 350 N.J. Super. at 213. While this may be true, generally, subsequent decisions—albeit unpublished—by the Appellate Division have continued to apply the requirement that "plaintiff was performing satisfactorily," even after the New Jersey Supreme Court's 2005 decision in *Zive. See, e.g., Powell v. Hunterdon Care Center*, 2009 WL 1789450 (N.J. Super. Ct. App. Div. June 25, 2009) ("In order to succeed on a cause of action under the New Jersey Family Leave Act alleging adverse employment action, a plaintiff must prove: (1) plaintiff was employed by defendant; (2) plaintiff was performing satisfactorily; (3) a qualifying member of plaintiff's family was seriously injured; (4) plaintiff took or sought to take leave from his employment to care for his injured relative; and (5) plaintiff suffered an adverse employment action as a result.") (citing *DePalma*, 350 N.J. Super. at 213); *Drago v. Communication Workers of Am.*, 2007 WL 92606 (N.J. Super. App. Div. Jan. 16, 2007) ("The elements of a cause of action under the [FLA] therefore are: (1) plaintiff was employed by defendant; (2) plaintiff was performing satisfactorily; (3) a qualifying member of plaintiff's family was seriously injured; (4) plaintiff took or sought to take leave from his employment to care for his injured relative; and (5) plaintiff

suffered an adverse employment action as a result.") (citing *DePalma*, 350 N.J. Super. at 213).

The Third Circuit has also continued to apply the *DePalma* standard in assessing claims brought under the NJFLA, even after the New Jersey Supreme Court's decision in *Zive. See Tucker v. County of Monmouth*, 159 Fed. Appx. 405, 408 (3d Cir. 2005) ("To make out a claim under the New Jersey [Family Leave] Act, they must show that "(1) [they were] employed by defendant; (2) [they were] performing satisfactorily; (3) a qualifying member of [their] family was seriously injured; (4) [they] took or sought to take leave from [their] employment to care for [their] injured relative; and (5) [they] suffered an adverse employment action as a result.") (citing *DePalma*, 350 N.J. Super. at 213). In light of the foregoing, the Court does not conclude that the New Jersey's Supreme Court decision in *Zive* (addressing an NJLAD claim) eliminated Plaintiff's requirement to show that she was performing her job satisfactorily during the relevant time period, in the context of a claim for violation of the NJFLA. Thus, the Court will continue to apply the standard for adjudicating claims brought under the NJFLA set forth by the Appellate Division in *DePalma. See, e.g., Carvalho v. Aircraft Serv. Int'l, Inc.*, 2013 WL 5567164, at *10 (D.N.J. Oct. 8, 2013) (applying *DePalma* standard in adjudicating claim for violation of the NJFLA).

The Court concludes that Plaintiff has failed to come forward with evidence that she was performing her job satisfactorily during the relevant time period. To the contrary, it is undisputed that in, July 2008, UMDNJ suffered from a backlog of files that needed to be scanned so that coders could work with them and that UMDNJ asked Plaintiff to come on-site to help scan, but Plaintiff refused. (Def. 56.1 Stmt., ¶¶ 25-27; Pl. Response, ¶¶ 25-27). It is also undisputed that, as to Plaintiff's overall coding accuracy, her error rate was 38% in March 2008, 27% in April of 2008, 22% in May 2008, 13% in June 2008, and rose to 32% in July 2008. (*Id.*,

¶¶41-43). Plaintiff concedes that all of the preceding error rates were below UMDNJ standards. (*Id.*, ¶44); (Preuss Cert., Ex. S; Ex. D at 170:25–171:9; Exhibit E at 126:17-21). There is also evidence in the record that Plaintiff received a formal counseling concerning her error rates on August 7, 2008. (Preuss Cert., Ex. D). Pursuant to this August 7, 2008 email from Judith Powers, the formal counseling was intended to give Plaintiff an opportunity to improve before UMDNJ moved to the next step of the "progressive discipline system." (*Id.*). Finally, it is undisputed that Plaintiff received a poor performance review in mid-December 2008. (Pl. Supplemental 56.1 Stmt., ¶ 40; Def. Response, ¶ 40); (Shishkin Dec., Ex. EE).

In light of Plaintiff's failure to point to any evidence in the record from which a finder of fact could reasonably infer that she was performing her job satisfactorily when the alleged NJFLA violation(s) occurred, it follows that no reasonable jury could conclude that UMDNJ violated Plaintiff's rights under the NJFLA. *See generally Drago,* 2007 WL 92606, at *13 ("The elements of a cause of action under the [FLA] therefore are: (1) plaintiff was employed by defendant; (2) plaintiff was performing satisfactorily; (3) a qualifying member of plaintiff's family was seriously injured; (4) plaintiff took or sought to take leave from his employment to care for his injured relative; and (5) plaintiff suffered an adverse employment action as a result.") (citing *DePalma,* 350 N.J. Super. at 213). Defendant's motion for summary judgment as to Counts Four and Five is granted.

## CONCLUSION

Based on the reasons set forth above, Defendant's motion for summary judgment is granted as to Counts Four and Five of the Amended Complaint, and is denied as to Counts One and Two. Count Three of the Amended Complaint is hereby deemed withdrawn. This matter

will proceed solely as to Counts One and Two—namely, Plaintiff's claims of interference and retaliation under the FMLA.

An appropriate Order accompanies this Opinion.

s/ Jose L. Linares
Jose L. Linares
Date:   December 20, 2013                          United States District Judge